James HATTON, Plaintiff,

v.

The **TABARD PRESS CORPORATION**, Defendant.

No. 65 Civ. 1479.

United States District Court
S. D. New York.

May 2, 1967.

Robert M. Morgenthau, U. S. Atty., for S. D. New York, by Dawnald R. Henderson, Asst. U. S. Atty., for plaintiff.

Buell Clifton & Turner, by Hugh M. Finneran, New York City, for defendant.

## OPINION

TYLER, District Judge.

Plaintiff James J. Hatton, a veteran of the armed forces of the United States, sues to recover the stipulated amount of $248.70 allegedly due him from defendant The Tabard Press Corporation ("Tabard"), a printing firm, pursuant to Section 9 of the Universal Military Training and Service Act, 50 U.S.C. App. § 459. On June 27, 1966, cross-motions for summary judgment were denied by Judge Edelstein of this court, 255 F.Supp. 468. Subsequently, on March 3, 1967, the case was tried before me without a jury. The following discussion embodies the findings of fact and conclusions of law of that one-day trial.

## I. BACKGROUND FACTS

The chronology of relevant events is undisputed. Hatton was employed by Tabard on January 25, 1960. For a year, plaintiff's duties were menial and included such tasks as the carrying of proofs, papers and packages to and from customers. A year later, on or about January 25, 1961, he became a "miscellaneous composing room employee" whose work involved messenger duties, sorting and putting away furniture, cuts and plates, operating the proof press, and pulling proof from the presses for "readers" of clients. Hatton performed these

duties for about a year and then, on January 25, 1962, entered the military service.

At the time when Hatton left Tabard, he was not and had not been a member of any labor union and, consequently, his rights as an employee were not covered by any collective bargaining agreement. On November 24, 1963, while Hatton was in the armed services, the New York Typographical Union No. 6 ("Local No. 6"), as agent for Printing Utilities Branch of Local No. 6 ("Utilities Branch"), and the Printers League Section, Printing Industries of Metropolitan New York, Inc. ("League"), as representative for various printing firms, of which Tabard was one, entered into a collective bargaining agreement, hereinafter called the "Utilities Branch-League agreement". This agreement, in Section 4, established specific wage rates, based upon "experience", for employees in the position occupied by plaintiff before he entered the armed forces. This agreement contained only a few other substantive provisions in addition to the one relating to wages. Therefore, in order to more fully define the status of Utilities Branch employees, Section 8 of the agreement incorporated by reference a separate and more expansive collective bargaining agreement, entered into on the same day, between Local No. 6, acting in its own behalf, and the League. This second agreement is hereinafter referred to as the "Local No. 6-League agreement".

Hatton was honorably discharged from the armed services on December 19, 1963. He had acquired no printing experience while in the military. On or about February 2, 1964, he was restored by defendant as a miscellaneous composing room employee on the night shift at a weekly wage of $59.34, the rate received pursuant to the Utilities Branch-League agreement by an employee with less than one year's "experience".

On or about March 1, 1964, Hatton became a member of the Printing Utilities Branch of Local No. 6. On March 19, 1964, his weekly wage was raised to $66.75, retroactive to February 2, 1964.

This was the rate paid to an employee with more than one but less than two years' experience. Presumably, therefore, plaintiff received an increase because, counting time served before his military service, he had worked for a year as a miscellaneous composing room employee as of February 2, 1964.

On May 23, 1964, plaintiff was notified that he would be laid off by Tabard because of lack of work and, on May 29, 1964, he was laid off. He has not been employed by Tabard as a miscellaneous composing room employee since that date.

## II. TABARD'S PROMOTION SYSTEM

Section 4 of the Utilities Branch-League collective bargaining agreement structures the minimum wage scales for miscellaneous composing room employees. Such wage scales are predicated upon an employee's "experience", but nowhere in either the Utilities Branch-League agreement or the Local No. 6-League agreement is the term "experience" defined.

"Experience" for wage purposes should be distinguished from the term "priority standing", found in Section 45 of the Local No. 6-League agreement, which is incorporated into the Utilities Branch-League agreement by Section 8 of the latter. Section 45 provides, *inter alia,* as follows:

> "The priority standing of employees shall be determined in accordance with the records maintained by the chapel chairman. Priority standing of an employee shall date from time of employment."

An examination of the whole of Section 45 indicates that an employee's "priority standing" assumes significance for purposes of lay-offs and discharges when there is a lack of work within an individual printing firm. There is no indication that the concept plays any role in determining whether or not an employee such as Hatton has gained the requisite "experience" for wage purposes. Accordingly, "experience" cannot be properly analyzed in terms of "priority standing".

The foregoing discussion and the absence of any specific definition of "ex-

perience" require the conclusion that Tabard's system of promoting miscellaneous composing room employees cannot be adequately explained by examining the two collective bargaining agreements involved in this case. This does not, however, foreclose a rational analysis of the problem, for defendant's promotion policies have been explained fully in a deposition of the defendant, taken through Nathan Sorkin, who was president, secretary and general manager of defendant as of July 8, 1965, the date of the deposition.

According to Sorkin's uncontroverted testimony, an employee like Hatton was given credit for a year's experience and, in turn, granted a wage increase only after a review of his record indicated that such steps were warranted by his on-the-job performance. It was Tabard's policy that an employee either received the increase or was discharged from his job.[1] The evaluation, which was critical in light of this policy, was undertaken in the manner described immediately below.

As the end of a year's employment approached, the company's bookkeeper would notify the employee's foreman of the advent of the anniversary. Shortly thereafter, the foreman and Sorkin would confer about the performance of the individual involved over the course of the year.

The criteria used in deciding whether to grant the increase or to discharge were not specific. Sorkin testified that, to warrant an increase, a man had "to show constant improvement and character and willingness and adaptability." Deposition of Nathan Sorkin, p. 21 (hereinafter "Sorkin dep."). Conversely, he stated that pay increases had been denied for "lack of progress and lack of adaptability and general attitude." Sorkin dep., pp. 18–19.

In no instance was an individual like Hatton promoted automatically or without a review of his record. Although Sorkin stated that, "barring unforeseen things, we usually move the young man up", he added that "no pay increase is ever moved on without my okay. That is company-wide. I okay every increase in pay, no matter why or what." Sorkin dep., p. 18.

In evaluating the performance of the individual, no formal test was given. Rather, "there is constant observation of the employee's progress in his job; the experience and the skills which he develops in a manual sense, a dexterous sense, and also in his general attitude, the way he moves, the way he works, the way he looks at things, and the way he does what he has to do." Sorkin dep., p. 24. Thus, in a sense, an employee like Hatton was tested every day.

Management did not have unbridled discretion to discharge an employee if it believed his job performance did not warrant a wage increase. Under the terms of Section 45 the Local No. 6-League agreement, the general foreman, and no other person, could discharge an employee for "incompetency" or for "neglect of duty". An employee had certain grievance procedures available to him if he believed that he had been unjustly discharged.[2] This provision applied expressly to miscellaneous composing room employees like Hatton as a result of its incorporation by reference in Section 8 of the Utilities Branch-League agreement. Thus, according to Sorkin, to dismiss a miscellaneous composing room employee, "it is incumbent upon management to show sufficient and justifiable cause". Sorkin dep., p. 25.

This check on management is not of primary significance here, however, in that it pertains principally to a balancing of the power vested in labor and management rather than to the basic method used to determine whether an employee would receive the year's experience

---

1. That this was Tabard's policy, as stipulated by counsel during trial, is largely irrelevant to the principal issue here presented; as will be discussed infra, the critical point is management's discretion in granting increases.

2. The particular aspects of this grievance procedure are not important here.

requisite to a wage increase. As the following discussion will show, it is the latter consideration which is dispositive of the case at bar.

### III. THE COMPETING CLAIMS

Plaintiff maintains that, during the period when he worked for Tabard after his discharge from military service (February 2–May 29, 1964), he should have been credited for his service time and thus paid by Tabard at the rate applicable to miscellaneous composing room employees who had more than three but less than four years' "experience" rather than at the rate paid those with more than one but less than two years' "experience". Defendant claims that plaintiff was correctly placed in the latter category and was not entitled to any "experience" credit for time spent in military service.

■ Section 9 of the Universal Military Training and Service Act, upon which petitioner relies, reflects a congressional policy

"that a returning veteran who has been separated from the service under the conditions set forth in the statute be restored by his employer to his former position or to a position of like seniority, status, and pay. He is not to be disadvantaged by serving his country." (McKinney v. Missouri-Kansas-Texas R. Co., 357 U.S. 265, 270, 78 S.Ct. 1222, 1226, 2 L.Ed.2d 1305 (1958)).

Specifically, Section 9(c) implements this policy by providing that

"(1) Any person who is restored to a position in accordance with the provisions of paragraph (A) or (B) of subsection (b) [of this section] shall be considered as having been on furlough or leave of absence during his period of training and service in the armed forces, shall be so restored without loss of seniority, shall be entitled to participate in insurance or other benefits offered by the employer pursuant to established rules and practices relating to employees on furlough or leave of absence in effect with the employer at the time such person was inducted into such forces, and shall not be discharged from such position without cause within one year after such restoration.

(2) It is declared to be the sense of the Congress that any person who is restored to a position in accordance with the provisions of paragraph (A) or (B) of subsection (b) [of this section] should be so restored in such manner as to give him such status in his employment as he would have enjoyed if he had continued in such employment continuously from the time of his entering the armed forces until the time of his restoration to such employment."

■ The statute does not, however, contemplate that in each and every aspect of employment a returning veteran will be treated as if he had continuously been working for the employer by whom he is re-hired. The Supreme Court has said that

"[Section] 9(c) does not guarantee the returning serviceman a perfect reproduction of the civilian employment that might have been his if he had not been called to the colors. Much there is that might have flowed from experience, effort, or chance to which he cannot lay claim under the statute. Section 9(c) does not assure him that the past with all its possibilities of betterment will be recalled. Its very important but limited purpose is to assure that those changes and advancements in status that would necessarily have occurred simply by virtue of continued employment will not be denied the veteran because of his absence in the military service. The statute manifests no purpose to give to the veteran a status that he could not have attained as of right, within the system of his employment, even if he had not been inducted into the Armed Forces but continued in his civilian employment." (McKinney v. Missouri-Kansas-Texas R. Co., supra at 271–272, 78 S.Ct. at 1226)

The issue, of course, is whether or not the type of pay increase herein involved is one to which plaintiff was entitled as

a result of his military service. Placed in specific context, the question here presented is whether Tabard's pay-increase system was "geared to skill and proficiency flowing from actual job experience or [was] geared to the mere passage of time." Alfarone v. Fairchild Engine and Airplane Corp., 32 F.R.D. 19, 25 (E.D.N.Y.1963).[3]

The question must be answered in Tabard's favor in that the wage increase in issue was one which did not accrue to an employee automatically as a result of a year's employment; rather, it was the product of an exercise of management discretion, which, in turn, was based upon an evaluation of job proficiency The completion of a year's work had some significance in that it made an employee eligible for a pay increase; it did not, however, give him any right to an increase since the raise resulted only if management, in conjunction with the union, decided it was warranted.

In this context, the case at bar is distinctly different from Tilton v. Missouri Pacific R. Co., 376 U.S. 169, 84 S.Ct. 595, 11 L.Ed.2d 590 (1964). There, plaintiffs, returning veterans, claimed that the defendant railroad wrongly failed to grant them certain "seniority" credit for the period spent in the armed services. The Supreme Court upheld the contention on the rationale that such credit was awarded automatically upon the elapse of a definite period of time and was not contingent upon the exercise of any degree of discretion by management. Thus, where the only basis for advancement was completion of a specified work period, the court held that returning veterans should be treated as if they had in fact been continuously employed during their period in the military service. Insofar as Accardi v. Pennsylvania R. Co., 383 U.S. 225, 86 S.Ct. 768, 15 L.Ed.2d 717 (1966) rests on similar grounds (383 U.S. at 229–230, 86 S.Ct.

768), it can be similarly distinguished from the instant case.

The fact that Tabard granted increases to employees like Hatton only after an evaluation of the employee's proficiency also distinguishes this controversy from Alfarone v. Fairchild Stratos Corp., 218 F.Supp. 446 (E.D.N.Y.1963), where the court found that raises given after a definite period of time without demonstration of increased skill were "automatic" and were therefore available to veterans who could show that they would have stayed in the position involved for the requisite period. 218 F.Supp. at 447–448. Borges v. Art Steel Co., Inc., 246 F.2d 735 (2d Cir. 1957), and Moe v. Eastern Air Lines, Inc., 246 F.2d 215 (5th Cir. 1957) adopted rationales similar to that used in *Alfarone* and can therefore be properly distinguished on the same ground.

The crucial distinction between preference based only upon time served and that based upon management discretion has been carefully noted by the Supreme Court. In McKinney v. Missouri-Kansas-Texas R. Co., supra, Mr. Justice Frankfurter said that

"on application for re-employment a veteran is not entitled to demand that he be assigned a position higher than that he formerly held when promotion to such a position depends, not simply on seniority or some other form of automatic progression, but on the exercise of discretion on the part of the employer." (357 U.S. at 272, 78 S.Ct. at 1227)

Six years later, in Tilton v. Missouri Pacific R. Co., supra, Mr. Justice Goldberg put the following gloss upon this statement:

"Properly read, therefore, *McKinney* holds that where advancement depends on an employer's discretionary choice not exercised prior to entry into service, a returning veteran cannot show

---

3. In this case, Chief Judge Zavatt denied cross-motions for summary judgment. At trial, Judge Dooling adopted *verbatim* Chief Judge Zavatt's framing of the issue. Alfarone v. Fairchild Stratos Corp., 218 F.Supp. 446, 447 (E.D.N.Y.1963).

within the reasonable certainty required by the Act that he would have enjoyed advancement simply by virtue of continuing employment during the time he was in military service." 376 U.S. at 180, 84 S.Ct. at 602.

■ In terms of the *McKinney* and *Tilton* cases, the vesting of the discretion in management to evaluate an employee's performance at the end of each year and to promote or to discharge on the basis of that evaluation is dispositive of this controversy. Advancement in one year was not binding upon management in the next. Accordingly, Tabard had not exercised its discretionary choice before Hatton left for the service. Plaintiff, therefore, cannot reasonably demonstrate that he would have enjoyed continuing employment. *A fortiori*, he is unable to claim under the statute any pay increases which would have accrued as a result of continuing employment.

Accordingly, judgment must be entered for defendant.